Filed 6/17/22  In re C.B. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re C.B., Person Coming Under the Juvenile Court Law. | B311957 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.A.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 19CCJP00683 |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet, Judge Pro Tempore. Affirmed.

Carolyn S. Hurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

The juvenile court terminated the parental rights of C.A. (mother) with respect to her son, C.B., under Welfare and Institutions Code[1] section 366.26. On appeal, mother challenges the juvenile court orders denying two separate petitions filed under section 388 to modify the order terminating her reunification services. Finding no error, we affirm.

## BACKGROUND

C.B. was the subject of a prior dependency petition. On February 22, 2017, the Department of Children and Family Services (Department) received a referral alleging mother and Christopher B. (father)[2] were arguing over money, their relationship, and mother's discipline of C.B when father pushed, punched, and strangled mother in the presence of C.B. Mother stated there had been at least 10 prior domestic violence incidents between the parents and one incident led to father's arrest in Omaha. Consequently, in March 2017, the juvenile court sustained a dependency petition alleging (1) the parent's history of domestic violence in C.B.'s presence endangered his health and safety and placed him at risk of serious physical harm and (2) mother's mental and emotional problems endangered C.B.'s physical health and safety and placed him at risk of serious physical harm. After the parents participated in and completed court-ordered programs, the juvenile court returned C.B. to

---

[1]     All undesignated statutory references are to the Welfare and Institutions Code.

[2]     Father is not a party to this appeal.

2

mother. Ultimately, the juvenile court terminated jurisdiction over C.B. in November 2018.

The current dependency case arose in January 2019 when C.B. was three years old. The Department received a referral alleging C.B. was a victim of general neglect. A police officer went to mother's apartment to investigate a report she was having issues with father. After the officer knocked a few times, C.B. opened the door. Because the parents were in the bathroom and C.B. was alone, the officer entered the apartment. Mother reported father had been blocking her from leaving the apartment. Maternal grandmother, who was on the phone with mother at the time of the incident, called the police. Mother explained she was staying in the apartment as a client of a shelter program. Moreover, mother had allowed father to reside in the apartment with her and C.B. even though she had an active restraining order against him. Ultimately, the officer arrested father because he was in violation of an active restraining order and had a warrant out for his arrest. The warrant stemmed from an incident of domestic violence by father against mother.

The same day father was arrested, a Department social worker went to mother's apartment. When the social worker arrived, she saw mother packing her bags. Mother claimed she was moving to Nebraska because father was in jail. When talking to the social worker, mother became emotional and stated she stayed with father because of financial issues. Moreover, mother explained she suffered from posttraumatic stress disorder (PTSD) from all of the domestic abuse she experienced from father. The social worker interviewed maternal grandmother the same day. Maternal grandmother stated mother had left father in the past,

but she had always returned to him for financial assistance. The following day, the Department obtained a removal warrant and removed C.B. from his parents. The Department placed C.B. in a foster home and filed a section 300 petition on his behalf.

In April 2019, after mother pled no contest, the juvenile court sustained the petition under section 300, subdivisions (a) and (b). In so doing, it found (1) C.B. was at substantial risk of serious physical harm due to the parents' history of domestic violence and engaging in violent altercations in the presence of C.B. and (2) C.B.'s physical health and safety was placed at risk due to mother's failure to protect C.B. from father.

The juvenile court declared C.B. a dependent of the court and ordered he remain in foster care. Mother's court-ordered case plan required her to (1) complete a 26-month domestic violence program for victims, (2) participate in parenting education, and (3) participate in individual counseling with a therapist.

Soon after the disposition hearing, mother moved to Nebraska to live with a maternal uncle. While there, mother reported to a Department social worker that she had completed a parenting class, had enrolled in another parenting class, and was on a list for a domestic violence program. The social worker told mother the Department needed more information from mother about the classes and program.

In September 2019, mother provided the Department with confirmation she had completed a 16-week parenting program. Mother, however, had yet to begin individual therapy or a domestic violence class. During this period mother stayed in contact with C.B. using FaceTime. On two occasions, once in June and once in August, mother was in California and visited C.B. in person.

At the six-month review hearing, the juvenile court found continued jurisdiction was necessary. Among other things, the juvenile court found mother was in "meager" compliance with the case plan. Accordingly, the juvenile court ordered continued reunification services and set the 12-month review hearing.

By October 2019, mother had enrolled in a domestic violence program and individual counseling. Mother, however, completed only three individual counseling sessions and two domestic violence classes before leaving the program. During this review period, mother failed to keep in contact with the Department. More specifically, mother failed to return emails and phone calls. The Department was, therefore, unable to schedule meetings with her. Mother's physical visits with C.B. were limited during this period although she maintained FaceTime visits two or three times a week. In November 2019, C.B. was placed with paternal grandmother in Nebraska. In April 2020, the Department recommended termination of reunification services.

In May 2020, maternal grandmother reported the parents had arrived unexpectedly in Nebraska. They told paternal grandmother they drove from California together. During this time, a social worker from Nebraska reported the police were investigating a new April 2020 domestic violence incident between the parents. By June 2020, the parents had moved back to California together. After the parents moved to California, they would FaceTime C.B. together once or twice a week.

In September 2020, the Department reported it had received no contact from mother despite its emails requesting contact. Moreover, mother failed to attend the 12-month review hearing in October 2020 even though the hearing had been

continued to give her proper notice. At the hearing, the juvenile court found the Department had provided the parents with 20 months of reasonable family reunification services, but the parents had failed to comply. Consequently, the juvenile court terminated family reunification services and set a section 366.26 hearing for February 2021.

On January 27, 2021, mother filed a section 388 petition request to change the juvenile court's order to terminate reunification services. Mother requested the juvenile court take the section 366.26 hearing off calendar and either release C.B. to her or reinstate family reunification services and grant mother unmonitored overnight visits. The juvenile court summarily denied the petition finding mother was in partial compliance with her case plan and the circumstances were changing, but had not changed. Mother timely appealed.[3]

By the time of the February 2021 hearing, the parents were no longer visiting with C.B. although they telephoned weekly. Additionally, paternal grandmother disclosed she wanted to provide C.B. permanency through adoption.

The juvenile court continued the section 366.26 hearing from February to April 2021. On April 2, 2021, mother filed another section 388 petition. This petition was identical to the February petition other than an added letter from Single Parents of Power Counseling Agency dated February 9, 2021. The letter indicated mother completed 20 sessions of both individual counseling and domestic violence classes.

---

3     Immediately after the denial of her first section 388 petition, mother filed a second section 388 petition. Mother did not appeal the denial of the second petition. It is, therefore, not at issue in this appeal.

On April 16, 2021, the juvenile court denied mother's 388 petition without a hearing. It found mother's circumstances had not sufficiently changed and mother's request was not in C.B.'s best interest. Mother timely appealed. After denying mother's section 388 petition, the juvenile court terminated her parental rights.

## DISCUSSION

### I.    Denial of Section 388 Petition

#### A.    Legal Principles and Standard of Review

"Section 388 accords a parent the right to petition the juvenile court for modification of any of its orders based upon changed circumstances or new evidence. [Citations.]" (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478, fn. omitted.) "The [parent] has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child. [Citations.]" (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.) "In considering whether the [parent] has made the requisite showing, the juvenile court may consider the entire factual and procedural history of the case. [Citation.]" (*Id.* at p. 616.)

The juvenile court must hold an evidentiary hearing on a section 388 petition only if the petitioner makes a prima facie showing that circumstances have changed since the prior court order and that the proposed change of court order will be in the child's best interests. (Cal. Rules of Court, rule 5.570(a), (d), (e); *In re G.B.* (2014) 227 Cal.App.4th 1147, 1157.) While courts are to liberally construe section 388 petitions, "'[t]he prima facie

7

requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition.' [Citations.] The petition may not consist of 'general, conclusory allegations,'" and should include declarations or other attachments demonstrating the showing to be made at an evidentiary hearing. (*In re Samuel A.* (2020) 55 Cal.App.5th 1, 7, (*Samuel A.*).) In other words, a prima facie case "is not made . . . if the allegations would fail to sustain a favorable decision even if they were found to be true at a hearing." (*In re G.B., supra*, 227 Cal.App.4th at p. 1157; see *ibid.* [a "prima facie case is made if the allegations demonstrate that [the] two elements are supported by probable cause"].)

"Section 388 provides an '"escape mechanism"' for parents facing termination of their parental rights by allowing the juvenile court to consider a legitimate change in the parent's circumstances after reunification services have been terminated. [Citation.] This procedural mechanism, viewed in the context of the dependency scheme as a whole, provides the parent due process while accommodating the child's right to stability and permanency. [Citation.] After reunification services have been terminated, it is presumed that continued out-of-home care is in the child's best interests. [Citation.] Section 388 allows a parent to rebut that presumption by demonstrating changed circumstances that would warrant modification of a prior court order. [Citation.]" (*In re Alayah J., supra*, 9 Cal.App.5th at p. 478.)

With respect to the first prong of the test set forth above, "the [parent] must show *changed*, not changing, circumstances. [Citation.] The change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or

modification of the challenged prior order.' [Citation.]" (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615.)

When evaluating the second prong, the court may consider factors such as "the seriousness of the reason for the dependency and the reason the problem was not overcome; the relative strength of the parent-child and child-caretaker bonds and the length of time the child has been in the system; and the nature of the change in circumstances, the ease by which the change could be achieved, and the reason the change was not made sooner. [Citations.]" (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 446-447.) Moreover, where, as here, "reunification services have been terminated, the parents' interest in the care, custody and companionship of the child [is] no longer of overriding concern. [Citation.] The focus then shifts to the child's need for permanency and stability, and there is a rebuttable presumption that continued foster care is in the child's best interests. [Citations.]" (*Id.* at p. 448.) And, "[w]hen, as here, the permanent plan is adoption, that presumption is even more difficult to overcome. [Citation.]" (*Id.* at pp. 448-449.)

"We review the juvenile court's denial of a section 388 petition for an abuse of discretion. [Citation.]" (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 616.) "'["]The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." [Citation.]' [Citation.]" (*Ibid.*)

## B.  Analysis

We note mother's declaration attached to the second section 388 petition was verified by her attorney. The attorney's

9

verification was inadequate because her attorney did not have personal knowledge of the facts alleged therein. Additionally, mother's attorney did not set forth the reasons why the verification was not made by mother, as required when a party's attorney verifies a pleading on behalf of a party who is unable to do so. (See Code Civ. Proc., § 446, subd. (a).) Mother's declaration was, therefore, not made under penalty of perjury under the laws of the State of California. (See *In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1348 [petition did not establish prima facie showing because it was not verified by mother or accompanied by mother's sworn declaration supporting counsel's allegations].)

Even if we were to overlook this procedural defect, we would nevertheless agree with the juvenile court that mother's petition afforded no basis for the requested relief. We discuss the reasons below.

### 1.    Changed Circumstances

With respect to the first prong, mother argues the evidence in both section 388 petitions show a change of circumstances. In support, she emphasizes that per her declarations attached to her petitions and accompanying exhibits, she: (1) "completed her reunification services," (2) described "in detail what she had learned" from her services, (3) took "accountability" for failing to protect C.B. from domestic violence, and (4) could now "provide a safe and stable home" for C.B.

We disagree with mother's arguments. This case arose primarily due to concerns about mother's long-standing and unresolved domestic violence issues. The record reflects these issues persisted throughout her participation in her court-ordered case plan. Consequently, while we commend mother's efforts toward resolving her domestic violence issues, we cannot

10

conclude the juvenile court abused its discretion by finding she showed "changing" rather than "changed" circumstances.

The record reflects mother has a long history of domestic violence issues. A prior petition sustained against mother arose from a domestic violence issue with father. The incident that originally brought C.B. to the Department's attention in this case was also a domestic violence issue. Moreover, at the time this matter arose, father had an active warrant stemming from a separate domestic violence issue with mother. In April 2020, over a year after the start of this dependency case, the parents' relationship was still ongoing. At that time, father was charged with strangulation stemming from a new domestic violence incident with mother. Finally, based on the letter from mother's therapist, it appears mother was not forthcoming regarding her continued relationship with father or about the new April 2020 domestic violence incident.

Mother argues she took responsibility for placing C.B. at risk of domestic violence from the "start of the case" and points to an email she wrote in January 2019. The record, however, shows mother continued her relationship with father well after she wrote the email. Over a year after the email, domestic violence continued to be an issue between the parents. For example, as noted above, in April 2020, father was criminally charged for strangling mother. Additionally, mother contradicts herself as she also claims she did not "realize" the relationship with father would not change until April 2020, over a year after she wrote the email.

With respect to mother's completion of domestic violence classes, mother provides conflicting evidence in support of her petition. The record is not clear that mother competed both the

domestic violence program and individual counseling. Moreover, it cannot be reasonably argued that mother participated regularly in the court-ordered treatment programs. The letter attached to mother's second section 388 petition refers to a May 19, 2020 progress letter. The progress letter was not, however, attached to the petition. Additionally, the February 2021 letter states mother completed a total of 26 sessions. The letter, however, does not indicate which classes were domestic violence and which were individual counseling. Finally, the letter states mother was provided a certificate of completion indicating she attended 20 sessions for each service, for a total of 40 sessions. Mother, however, did not include the certificate in her petition. While mother's petition did include a certificate stating she completed domestic violence classes for victims, the certificate is not dated, does not state how many sessions of domestic violence counseling mother completed, nor does it mention individual counseling.

Based on this evidence, the juvenile court could reasonably conclude mother failed to demonstrate she had completed all court-ordered services and did not establish she had resolved her domestic violence issues. Accordingly, the juvenile court did not "exceed[ ] the bounds of reason" (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 616) by finding mother failed to show a change in circumstances "'of such significant nature'" to justify setting aside the prior order terminating her reunification services. (*Id.* at p. 615.)

In support of her arguments, mother compares her case to *In re Hashem H.* (1996) 45 Cal.App.4th 1791 (*Hashem H.*). There, the petitioning parent described her continuous participation in therapy and attached a letter from her therapist

describing her progress in therapy and her ability to care for the child. (*Id.* at pp. 1796-1799.) Here, as noted above, mother did not conclusively demonstrate she had completed all court-ordered services or that she had overcome the problems which led to the dependency jurisdiction. (Cf. *In re I.B.* (2020) 53 Cal.App.5th 133, 157 [mother's untangling herself from father's financial control, understanding of what was necessary to permanently leave father, and ability to stay away from father for eight months despite his offers to provide assistance demonstrated changed circumstances] & *In re J.M.* (2020) 50 Cal.App.5th 833, 846 [concluding mother offered substantial evidence she had completed all domestic violence training, she resolved the domestic violence underlying the initial dependency petition, and she had not been in another potentially violent or abusive relationship].)

### 2. Child's Best Interest

In addressing the second prong, mother argues "she had a preexisting bond with [C.B.], and she was now able to provide a safe environment filled with love and support." Considering the factors set forth in *In re Aaliyah R.*, *supra*, 136 Cal.App.4th at pp. 446-447, we conclude the juvenile court did not abuse its discretion by finding the requested order was not in C.B.'s best interests.

First, as discussed above, mother has not shown she has resolved her long-standing, domestic abuse issues giving rise to this case. (Section I.B.1, *ante*.)

Next, C.B. has not been in mother's care for much of his life. He was placed in foster care when he was three years old and has not lived with mother since then. Moreover, C.B. has lived with paternal grandmother, his prospective adoptive parent,

13

consistently since November 2019. Thus, by the time of the final hearing on mother's section 388 petition, C.B. had not been in mother's care for over two and a half years, almost half of his life.

Third, the record demonstrates C.B. views his placement residence as his home and has a strong bond with paternal grandmother. He refers to mother by her first name and refers to paternal grandmother as "mom." C.B. appeared to be thriving in his placement with paternal grandmother and was bonded to her. The social worker from Nebraska reported C.B. was very affectionate to paternal grandmother and would hug and kiss her without being prompted.

Lastly, the evidence regarding mother's visits with C.B. demonstrates that at the time of her section 388 petitions, C.B.'s bond with mother was not similar in nature or strength to the bond he had with paternal grandmother. After C.B. was placed with paternal grandmother, mother visited C.B. only periodically. After the parents moved back to California in June 2020, the parents visited with C.B. only via FaceTime. Additionally, C.B. did not remember ever living with his parents.

Given his strong attachment to paternal grandmother, and the sense of stability and normalcy she provided for C.B., the Department opined that C.B. "would be placed at risk of physical and emotional harm again if he were released to either parent's care."

Mother asks us to focus on the bond between her and C.B. at the time this case began. Moreover, she points to her regular phone calls to C.B. *after* the juvenile court terminated reunification services. Finally, mother points to C.B.'s comment that it was sad he had not seen his parents in a long time. Her arguments are unavailing because, as noted above, "[w]hen two

14

or more inferences can reasonably be deduced from the facts, [we] ha[ve] no authority to substitute [our] decision for that of the trial court." [Citation.]' [Citation.]" (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 616; see also *In re Anthony W.* (2001) 87 Cal.App.4th 246, 251 ["Mother made no showing how it would be [in] the children's best interest to continue reunification services, to remove them from their comfortable and secure placement to live with mother who has . . . a recurring pattern of domestic violence in front of the children"].) Moreover, "[t]he fact that the parent 'makes relatively last-minute (albeit genuine) changes' does not automatically tip the scale in the parent's favor." (*In re D.R.* (2011) 193 Cal.App.4th 1494, 1512.)

In support of her argument that she had a substantial bond with C.B., mother cites *In re Aljamie D.* (2000) 84 Cal.App.4th 424. Mother's reliance on *In re Aljamie D.* is misplaced. There, unlike in this case, two minors repeatedly stated and ultimately testified about their desire to live with their mother. (*Id.* at p. 432.) Here, other than C.B.'s comment that he was sad he had not seen his parents in a long time, there is nothing in the record to support mother's contention she had a close bond with him. In fact, as noted above, C.B. did not remember living with his parents.

Accordingly, on the record before us, we conclude the juvenile court could reasonably find mother's bond with C.B. was not of such a strong, compelling nature to rebut the presumption that it was in C.B.'s best interests to remain in the care of paternal grandmother. (See *In re Aaliyah R.*, *supra*, 136 Cal.App.4th at p. 448.) The court therefore did not "exceed[ ] the bounds of reason" (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 616) by finding that it was not in C.B..'s best interests to return

15

him to mother, to allow mother to have overnight or unmonitored visits, or to grant mother further reunification services.

### 3. Conclusion

For the reasons discussed above, the juvenile court did not abuse its discretion by denying mother's section 388 petitions.

## DISPOSITION

The orders denying mother's section 388 petitions and terminating mother's parental rights are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

CURREY, J.

We concur:

MANELLA, P.J.

COLLINS, J.

16