Filed 4/13/23  In re Ceasar L. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re CEASAR L., et al., Persons Coming Under the Juvenile Court Law. | B318616 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP03306A-B) |
| Plaintiff and Respondent, | |
| v. | |
| ROSE C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Commissioner. Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Kelly Emling, Deputy County Counsel for Plaintiff and Respondent.

———————————————

Rose C. (mother) appeals from a February 1, 2022 order of the juvenile court denying her Welfare and Institutions Code[1] section 388 petition. Mother contends the juvenile court abused its discretion by denying her petition because she demonstrated changed circumstances and that granting her reunification services was in her children's best interests. We find no error, and thus we will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This is mother's second appeal in this dependency matter. In an opinion dated January 17, 2023 (case No. B314515), we affirmed orders sustaining the juvenile dependency petition, removing mother's children from her care, and denying mother family reunification services. We repeat the case history discussed in our first opinion to the extent it is relevant to the present appeal.

## I.     Prior juvenile dependency proceedings.

Ceasar L. (born in January 2008) and Gabriel C. (born in March 2010) are the children of mother and Ceasar L., Sr. (father). In October 2008, a petition was filed in Orange County juvenile court alleging, among other things, that father hit, slapped, and threw mother; mother and father had a violent

———————————————

[1]     All subsequent undesignated statutory references are to the Welfare and Institutions Code.

2

altercation while father was driving a car in which nine-month-old Ceasar was a passenger; mother became intoxicated to the point of passing out and then violently attacked a stranger and father; and mother had an unresolved history of alcohol and marijuana abuse.

In June 2016, the juvenile court sustained a petition pursuant to section 300, subdivisions (b) and (j) alleging that mother had been diagnosed with untreated major depression, had previously slapped Ceasar in the face, had a history of domestic violence with father, and had physically abused Gabriel by striking him in the face. The children initially remained in mother's custody under DCFS supervision, but were removed and placed with the maternal grandmother in September 2016 after the court sustained an amended petition pursuant to section 300, subdivisions (a), (b), and (j), alleging that mother physically abused Gabriel, had a history of physically assaulting the maternal grandmother and maternal aunt in the children's presence, and had recently struck the maternal grandmother and attempted to burn her with a cigarette in the children's presence. Gabriel was returned to mother's custody in June 2018, and Ceasar was returned to mother's custody in April 2019.[2]

Ceasar made further reports of physical abuse by mother in February, July, and August 2019. Those reports were investigated and closed as inconclusive.

---

[2] Father appears not to have been part of that proceeding because he was serving time in state prison.

## II.     Current petition.

In May 2020, DCFS received a report that mother had hit Ceasar and been arrested for public intoxication.  A children's social worker (CSW) interviewed Ceasar, who said that on the day mother was arrested, she had gotten drunk, hit Ceasar on the chest, stomach, and face, and had an altercation with his uncle.  Ceasar was afraid of mother and did not feel safe at home.  During a subsequent interview Ceasar said his mother drank secretly at night and "threw tantrums" daily.  Ceasar said he felt numb when mother threw tantrums, and he recently had locked himself in his bedroom and jumped down from his second-floor bedroom window to escape her.

Gabriel reported that mother drank beer after the boys went to sleep and had been drinking the day she was arrested.  That day, mother smacked Ceasar with an open hand on his face, chest, and stomach and screamed "the 'B-word.' "  Gabriel said that when mother drank, which happened "kind of often," she screamed at the boys and sent them to their room.  Gabriel thought mother " 'may have a little drinking problem,' " which made him feel sad and scared.  After mother's arrest, she screamed at Ceasar, told him he was " 'just like [his] dad,' " and called him the "b-word."

The maternal aunt said she had been very concerned about the boys since mother regained custody of them a year earlier.  According to the aunt, the children reported that mother got drunk constantly and locked them in their bedroom.  The maternal aunt believed the boys were afraid of mother and did not want to live with her.  The paternal grandmother gave a similar report, saying that Ceasar had recently run away from home because he was afraid mother was going to hit him.

4

Grandmother believed mother abused Ceasar, had a drinking problem, and used drugs. Further, she said mother had always "had something against" Ceasar and had said she did not want him because he was just like his father.

Mother denied having a substance abuse problem, saying she drank beer infrequently and did not use drugs. She denied hitting the children and said the maternal grandmother had been calling DCFS for years because she wanted Ceasar to live with her.

A juvenile dependency petition filed in June 2020 alleged that the children were juvenile court dependents pursuant to section 300, subdivisions (a), (b)(1), and (j) because on May 20, 2020, mother and the maternal great-uncle "engaged in violent and assaultive behavior" in the children's presence (counts a-1, b-2); mother previously physically abused Ceasar, and on May 20, 2020, she struck Ceasar on his face, chest, and stomach, putting both children at risk of harm (counts a-2, b-3, j-1); and mother had a history of substance abuse and was a current abuser of alcohol, which rendered her incapable of providing regular care of the children (count b-1).

At the June 25, 2020 detention hearing, the court found a prima facie case for declaring the children juvenile court dependents, but it released the children to mother with orders that she avoid corporal punishment, cooperate with unannounced visits by DCFS, drug test, and participate in family preservation services.

### III.  Amended petition and detention.

In early December 2020, DCFS received a report that Ceasar had called 911 after mother hit him in the face. Ceasar told a CSW that mother was not home when he woke up but

returned home at about noon visibly drunk.  Mother sent the boys to the store and was agitated when they returned.  She tried to hit Gabriel, who blocked her hits, and then sent the boys to their bedroom.  Subsequently, mother told Gabriel to leave the bedroom and punched Ceasar in the face with a closed fist.  Ceasar ran out of the house and called law enforcement.  Mother was arrested, and the children were brought to the maternal grandmother.  Ceasar said everything was fine at home when mother was not drunk, but her drinking and aggression had gotten worse since the DCFS case was opened.

Gabriel said he had not seen mother hit Ceasar, but he heard Ceasar saying, "Mom, stop."  Gabriel denied that mother physically abused either child.  Mother denied hitting Ceasar, but admitted drinking the night before while the children were asleep.  She said she drank once or twice a week because she was " 'bored,' " but insisted that the children never saw her drink.  She believed Ceasar had a "vendetta" against her because he was raised primarily by the maternal grandmother.  She "expressed frustration with the attention given to her relapse, citing that she is not an alcoholic and . . . is a good parent to her kids."

The juvenile court authorized the children's removal from mother on December 17, 2020, and it made detention findings on December 24, 2020.  Mother was granted monitored visits with Gabriel and monitored visits with Ceasar in a therapeutic setting.  The court ordered individual counseling for both boys.

DCFS filed a first amended petition on December 30, 2020, which added allegations of the most recent physical abuse of Ceasar to counts a-2, b-1, b-3, and j-1, and added a new count b-4, which alleged that father had an unresolved history of substance

6

abuse and an 18-year history of criminal convictions, including driving under the influence and corporal injury of a spouse.

## IV.  Jurisdiction and disposition hearing.

In January 2021, Ceasar told a CSW that mother tells him he is " 'stupid and retarded and all the cuss words.' "  Gabriel wanted to return to mother's custody, but Ceasar did not.  DCFS recommended that the court sustain the amended petition and offer mother reunification services.

In April 2021, DCFS reported that father had been paroled and had contacted the children.  Mother had not been in contact with DCFS, had not visited the children since late January, and missed scheduled drug tests in March and April.

On April 28, 2021, the juvenile court sustained the petition with the exception of a single count alleging domestic violence between mother and maternal great-uncle pursuant to section 300, subdivision (a).  With regard to disposition, Ceasar's counsel said that Ceasar did not want to reunify with mother, and counsel therefore requested that family reunification services be bypassed pursuant to section 361.5, subdivision (b)(3).  Gabriel's counsel similarly requested that mother not be offered reunification services, notwithstanding Gabriel's desire to reunify with mother.  Counsel argued: "Although in the most recent account, Gabriel has not been the victim of physical violence, mother does routinely involve Gabriel in the dynamic between herself and Ceasar. . . .  [Gabriel] is constantly in the position of having to deny that he knows what's going on, whereas it's clear that he hears what's going on, at the very least.  And, frankly, I think a lot of the times he sees it, as well, but denies it.  And I think that's a very bad sign.  I think it shows that Gabriel, like Ceasar, is very afraid of mother.  And I think that Gabriel is

7

acting in a way to protect himself. I'm looking at the jurisdiction report on page 16 where we have Gabriel denying—he says he doesn't know what happens when Ceasar gets in trouble. He denies knowing whether or not his mother hits Ceasar. And he says sometimes mother yells at them, but he doesn't remember when the last time that happened. And, again, further down, on page 17, he—he says that he doesn't know how mother disciplines his older brother. And according to the detention report, he says—the child stated that when mother drinks, she screams at him and his brother Ceasar and sends them both to their room. The child stated that this happens kind of often. So I think, Your Honor, that this is a very abusive situation both for Ceasar and for Gabriel. . . . And so, Your Honor, I am joining with [Ceasar's counsel] and asking the court [to] deny mother's family reunification with respect to Gabriel, as well as Ceasar." The court continued the hearing and asked the children's attorneys to brief the issue of reunification services.

DCFS reported in July 2021 that mother was attending individual counseling, anger management and parenting classes, and Alcoholics Anonymous. Mother had missed most of her scheduled drug tests, but had one negative test in June 2021. She had resumed visiting the children in late May, and although visits reportedly went well, Ceasar continued to say he did not want visits with mother.

At the July 6, 2021 disposition hearing, mother testified that she was attending anger management classes, parenting classes, individual counseling, and Alcoholics Anonymous, through which she was learning why she became so easily frustrated and to be less reactive with her children. She said visits with Gabriel were "great," and visits with Ceasar were "a

8

work in progress, but [were] getting better." Mother denied that she was an alcoholic and insisted she had been testing negative for drugs and alcohol for a year.

At the conclusion of mother's testimony, DCFS and both parents' attorneys requested that the parents be granted reunification services. Ceasar's counsel asked that mother be denied reunification services, noting that the juvenile court had twice sustained allegations of physical abuse of the children, the children had again been removed from mother's custody, and reunification was not in Ceasar's best interests. Counsel noted, moreover, that mother had previously been granted services and, even after completing services, had abused Ceasar while under the influence of alcohol: "[P]rior to the December 7th incident, . . . mother was continuously participating in [Alcoholics Anonymous], yet, she comes home drunk, assaults [Ceasar], assaults Gabriel, and then appears on the stand saying she's not an alcoholic. To me, after having three-plus years of family reunification and family maintenance services, it's hard to argue that she has responded to any services." Further, "Ceasar today does not want to visit with his mother, does not want to have a relationship with her. The visits sometimes occur in the family home, [in] maternal grandmother's home. Ceasar locks himself in his room. He doesn't want to have anything to do with her. So I would request the court not grant family reunification services based on [section] 361.5(b)(3)."

Gabriel's counsel joined in Ceasar's counsel's argument, and further noted that mother had only recently engaged in services, had missed a substantial number of drug tests, and had only recently begun visiting the children. Additionally, counsel said, while it was clear that mother loved her children, "what has

9

she done to actually show that love . . . to show that she's progressed in the services that she's received?  It's very clear that mother hasn't in any way, shape, or form responded to any of the services that were given to her or learned from them, hasn't accepted any responsibility or learned from them."

In a lengthy oral decision from the bench, the juvenile court concluded that section 361.5, subdivision (b)(3) applied and that offering mother reunification services was not in the children's best interests.  The court explained:  "Ceasar and Gabriel have two separate dependency cases in L.A. where they were declared dependents due to mother's physical abuse, first for physically abusing Gabriel and placing Ceasar at risk.  After mother had the children returned to her, she was under the influence of alcohol, abusing the children, as well as being violent with adult relatives and strangers.  The continued abuse of the children led to DCFS opening a new case and removing the children again from mother due to additional physical abuse, this time for abusing Ceasar and placing Gabriel at risk.  Thus, the [section] 361.5(b)(3) [family reunification] bypass provisions for previous removal does apply in this case.  [¶] . . . [¶]

"Here, [family reunification] services seem unlikely to be successful . . . [because] mother was abusing the children while under the influence of alcohol and has a long history of violent behavior towards the children, adult relatives, and strangers and is still in denial that she's an alcoholic.  [¶] . . . [¶]  As Ceasar's attorney pointed out, . . . at least part of the best interests analysis must be finding that further reunification services have a likelihood of success.  There must be some reasonable basis to conclude that reunification is possible before services are offered to a parent who need not be provided them.  Ceasar's counsel

10

argued that it is futile to offer mother family reunification services due to Ceasar and mother not having a strong bond, mother believing that Ceasar has attachment problems with her, and mother feeling like Ceasar does not love her. . . . Gabriel's counsel argued that there's no reasonable basis for successful reunification between mother and Gabriel because mother is in the grip of her addiction and has shown little insight into her violent behavior. And after receiving 46 months of either family maintenance or [family reunification] services in the last 60 months, mother has failed to make any meaningful progress. Children have compelling rights to be protected from abuse and neglect and to have a placement that is stable and permanent and which allows the caretaker to make a full emotional commitment to the child.

"Gabriel's counsel acknowledged that [Gabriel] loves his mother but that he is also bonded to the maternal grandmother, who has repeatedly been his caregiver as a result of mother's issues. And Gabriel's counsel added that mother's current efforts are poor in that she has not maintained contact with DCFS consistently, has not visited the children consistently since the end of January 2021, and has failed to submit to testing consistently, has a long history of violence and alcohol abuse. In considering these factors, the evidence presented supports a finding that ordering [family reunification] services for mother is not in the children's best interests as the facts do not indicate a likelihood of successful reunification.

"The burden of proving that reunification services are in the [children's] best interest[s] rests on the party seeking services. Here, mother has not submitted evidence to support a finding that it would be in the children's best interest to provide

her with [family reunification] services. While DCFS has recommended that [family reunification] services be provided to mother again, it has not provided any supporting evidence that the court can rely upon that mother is likely to take advantage of the services and successfully reunite with the children. Neither mother nor DCFS has met the burden of proving that, despite the bypass provisions, offering mother [family reunification] services would be in the children's best interest."

Based on the foregoing, the court ordered the children removed from mother, denied mother reunification services, and granted mother monitored visits with the children.

## V. Prior appeal.

Mother appealed from the jurisdiction and disposition orders. In an opinion filed January 17, 2023, we concluded there was abundant evidence that mother had physically abused Ceasar over the course of many years and had a severe, untreated addiction to alcohol. Accordingly, we found that the orders sustaining the dependency petition and removing the children from mother's care were supported by substantial evidence. We also found the juvenile court did not abuse its discretion by denying mother reunification services pursuant to section 361.5, subdivision (b)(3), and by concluding that the Indian Child Welfare Act did not apply to this case.

## VI. Mother's section 388 petition.

Mother filed a section 388 petition to change order in December 2021. She asked the court to order reunification services or return the children to her care, and to permit her unmonitored visits. In support, she said she had completed domestic violence and anger management programs, was

12

participating in substance abuse classes and individual counseling, and had been testing negative for all substances.

DCFS reported in December 2021 that Ceasar and Gabriel were well-bonded with the maternal grandmother, who had expressed interest in becoming their legal guardian. Ceasar did not want to visit mother and wanted maternal grandmother to be his legal guardian; Gabriel wanted to continue to have visits with mother and to return to her care if she was able to complete court ordered services, but said he wanted maternal grandmother to be his legal guardian if he could not reunify with mother.

DCFS reported that mother had completed domestic violence, substance abuse, and anger management classes, and she currently was enrolled in parenting classes and individual counseling. Mother also reported that she was attending a 12-step program on-line, but when the social worker attempted to contact mother to discuss the status of her enrollment, mother did not return the social worker's calls. Mother's therapist said in December 2021 that mother had been inconsistent with her attendance in the first few months, but now was opening up and doing well. According to the therapist, mother "has learned how to deal with aggressive people, how to be a nurturing parent, the effects of child abuse, how to effectively communicate in all relationships and the power of not reacting."

With regard to drug testing, mother missed all 14 of her scheduled drug tests between July and October 20, 2021. Between October 28 and December 7, mother missed one test and tested negative six times.

At a February 1, 2022 hearing, Gabriel's attorney opposed mother's section 388 petition, arguing that mother had not shown changed circumstances or that granting the petition was in

13

Gabriel's best interests. Counsel noted that mother had failed to show up for most of her drug tests, had not completed a substance abuse program, and had not really addressed her substance abuse or anger issues. Further, while Gabriel hoped to reunify with mother, "he is . . . clear that he does not want to reunify until and unless mother is sober because when she's drinking, she gets mad, and he knows what happens then." As a result, counsel did not believe it was in Gabriel's best interests for mother to receive reunification services.

Ceasar's counsel joined in Gabriel's attorney's arguments, and added that "there's this layer of dealing with the trauma and harm that she's caused both children over the years," and that "for Ceasar, this all started [when he was] an infant, before the age of one. And that is something that will also need to be addressed by mother for her to really reconcile what her role has been in all of those things and really deal with it before we can reach that space of . . . true changed circumstances." Further, counsel said, Ceasar "has been very clear from the very beginning of his detention in December of 2020 that he does not want to be with mother and he has experienced, repeatedly, what the circumstances are and what the risks are to him and to his brother. He continues to be clear about those wishes today—[he] does not want to reunify with mother [and] does not want to participate in reunification services with her."

Mother's counsel noted that mother had participated in a variety of services even though they had not been ordered by the court, and was holding down a part-time job and attending school, because "she wants to be able to show that she can provide a stable environment for her children." Counsel further argued that permitting mother reunification services was in the

14

children's best interests.  Counsel urged:  "[G]ranting mother's 388 will allow DCFS to work with mother and Ceasar in order for the mother and son to be able to have visits with each other.  Ceasar is growing up and he will need support from his mother.  Reunification services for mother will enable that relationship between mother and Ceasar to continue to grow.  [¶]  [DCFS's] report also indicates that visits between mother and Gabriel are going well.  Gabriel wants to reunify with his mother, and the court granting mother's 388 will ensure that happens."

The court denied mother's petition.  It explained:  "I do commend mother for engaging in these services; however, the pain and the trauma that she caused these children runs deep, and all of this information came out in our contested disposition hearing.  And there are many layers to this pain and trauma to these children caused by mother's abuse, which was fueled and contributed to by her aggression and her . . . substance abuse issues.

"Mother still has not demonstrated to the court that she is leading a sober lifestyle.  There were many no-shows, and she was nonresponsive to the social worker with regard to making up the drug tests or continuing to drug test after a certain point.  [¶] And it's unclear whether [mother's therapist] was in receipt of any of the reports.  The focus seems to be more about how she's dealing with aggressive people, but mother has the anger issues and aggressive behaviors towards others, and that, also, still, doesn't seem to be fully addressed[.]  [Accordingly,] at this time, the court does not find that she has shown—maybe changing circumstances—but she's not shown changed circumstances or that it's in the best interests of the children, and the court is going to deny mother's 388 at this time."

15

Mother timely appealed from the order denying the section 388 petition.

## DISCUSSION

Mother contends on appeal that the juvenile court erred by denying her section 388 petition. For the reasons that follow, we disagree.

Section 388 permits a parent to petition the juvenile court to modify any order based on changed circumstances or new evidence. To obtain the requested modification, the moving party must demonstrate by a preponderance of the evidence both a change of circumstance and that the proposed change of order is in the child's best interests. (§ 388; *In re Alayah J.* (2017) 9 Cal.App.5th 469, 478; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)

The change in circumstance must be such that the problem that brought the child into the dependency system has been removed or ameliorated; the change must therefore be significant or substantial. (*In re Mickel O., supra*, 197 Cal.App.4th at p. 615.) Circumstances must have changed and not be merely changing. (*Ibid.*) To determine whether this showing has been made, the court may consider the entire factual and procedural history of the case. (*Id.* at p. 616.) Whether to modify an order under section 388 rests in the juvenile court's discretion and will not be disturbed on appeal unless there has been a clear abuse of discretion. (*In re Mickel O.*, at p. 616.)

Mother contends that the juvenile court erred by denying her section 388 petition because she demonstrated changed circumstances and that granting her reunification services was in the children's best interests. With regard to changed circumstances, mother notes that she had completed domestic

16

violence and anger management programs, was participating in parenting and substance abuse classes, had begun individual counseling, and had drug tested for DCFS. While there is some support in the record for mother's contentions, we note that mother had only recently begun attending substance abuse classes consistently, had missed all of her scheduled drug tests between July and October 20, 2021, and had missed an additional drug test in November 2021. In short, as the juvenile court noted, mother had not demonstrated a sustained period of sobriety.

As other courts have noted, "[i]n the context of a substance abuse problem that has repeatedly resisted treatment in the past, a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program." (*In re N.F.* (2021) 68 Cal.App.5th 112, 121; see also *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [brief period of sobriety in context of extensive history of drug use did not demonstrate changed circumstances].) On the present record, therefore—and in light of mother's long history of alcohol abuse— the juvenile court was well within its discretion in concluding that mother showed, at best, *changing*, but not *changed*, circumstances. (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615.)

Further, as we noted in our prior opinion, the physical abuse of the children alleged in this case occurred *after* mother completed reunification services in the 2016 dependency case, and even while mother was receiving additional services in the present case. Against this backdrop, mother's participation in additional services, without more, did not conclusively establish changed circumstances.

17

For the same reason, the juvenile court was well within its discretion in finding that granting mother reunification services was not in the children's best interests. Mother had a history of physically abusing members of her family, including her children, when intoxicated, and she had continued to physically abuse Ceasar even after completing reunification services in the prior dependency case. Mother's alcohol abuse had caused significant upheaval in the boys' lives as they moved back and forth between mother's and grandmother's homes and spent years as juvenile court dependents. As a result, Ceasar was adamantly opposed to returning to mother's care, and although Gabriel hoped to be able to reunify with mother, he was clear that he did not want to do so unless and until mother was sober. Because there was no compelling evidence that mother had conquered her alcohol addiction or propensity for physical violence, the juvenile court did not abuse its discretion in concluding that granting mother further reunification services, thus further delaying permanency for the children, was not in their best interests.

## DISPOSITION

The order denying mother's section 388 petition is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

19